No. 91-621

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

GARY W. MANNIX,

      Plaintiff and Appellant,

  -vs-

THE BUTTE WATER COMPANY,
a New Jersey Corporation,
and DENNIS WASHINGTON,

      Defendants and Respondents.



APPEAL FROM:  District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable James E. Purcell, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Frank B. Morrison, Jr., (argued) John M. Morrison
and David Ness (argued), Morrison Law Offices,
Helena, Montana

      For Respondent:

          Ronald B. MacDonald (argued) and Darla J. Keck;
Datsopoulos, MacDonald & Lind, Missoula, Montana

Submitted:  January 21, 1993

Decided:  June 11, 1993

Filed:

<u>                             </u>
                Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

Appellant Gary Mannix (Mannix) appeals from a judgment entered pursuant to a special jury verdict in the Second Judicial District, Silver Bow County, and from the denial of his request for a new trial. The present case stems from the same set of facts and circumstances as our opinion in Mannix v. Butte Water Co. (1991), 249 Mont. 372, 816 P.2d 441. For clarity, we will refer to the Butte Water Company (BWC) and Dennis Washington (Washington) collectively as respondents. We affirm.

The following issues are raised on appeal:

1. Whether the District Court erred in sustaining respondents' hearsay objections;

2. Whether the District Court abused its discretion in granting respondents' motion for change of venue;

3. Whether the District Court erred in sustaining respondents' objection to lay witness opinion testimony;

4. Whether the District Court erred in granting respondents' motion in limine;

5. Whether the District Court abused its discretion in not allowing Mannix's expert witness to testify;

6. Whether the District Court erred in dismissing all claims based on breach of the implied covenant of good faith and fair dealing;

7. Whether the District Court abused its discretion in instructing the jury.

Mannix began working for BWC as a laborer in 1973. He was

2

eventually promoted to engineer, then to superintendent, then to vice-president and operations manager and member of the board of directors. When the general manager retired in 1983, Mannix was promoted to president and general manager, the position he occupied at the time this action arose.

Before this action arose, Atlantic Richfield Company (ARCO) owned a majority of BWC's outstanding shares. In September 1985, while negotiating a deal to buy ARCO's mining properties in Butte, Montana, Washington learned that BWC was also for sale. Washington and ARCO eventually entered a letter agreement whereby Washington would purchase ARCO's Butte mining properties, approximately 35,000 acres of property around Georgetown Lake, and BWC. At that time, BWC carried a $4.5 million note payable to ARCO. The agreement originally called for the full amount of the debt to be forgiven. However, from what he learned in meeting with Mannix and what he learned about the Public Service Commission's rate making process, Dorn Parkinson, who was the president of Washington Corporations, determined that it would be beneficial for BWC to retain some debt.

Washington and ARCO agreed to modify the original agreement to retain a $2 million debt in BWC. Washington arranged a $2 million, six-month loan with a Minnesota savings and loan association where he had a substantial personal line of credit. Washington personally guaranteed payment of the loan. The $2 million from the loan was to be paid directly to ARCO for its stock in BWC, and the purchase price for the properties was to be reduced by $2 million. The result was that Washington would receive the BWC stock free of

3

debt to ARCO, while BWC would have a six-month note payable to the savings and loan association for $2 million. ARCO did not inform Mannix of the details of this arrangement.

On December 12, 1985, Mannix received a call from John Thiebes, counsel for Washington Corporations. Mannix had left the office, so he returned the call the next day. Mannix claims Thiebes requested he travel to Missoula to sign some resolutions, the $2 million note, and some other papers. Mannix refused to do so because he wanted to check with ARCO's legal counsel. He called Gene Tidball, an attorney for ARCO, who informed him that he could sign the note and other papers.

Mannix discussed the matter with Mike Patterson and Bill Mufich, members of BWC's board of directors, and with Skip Dunfee, BWC's secretary-comptroller. According to Mannix, they determined that it was not in BWC's best interest to obligate it to a $2 million note, the terms and circumstances of which they knew little or nothing about. Eventually, however, Mannix, Patterson, and John O'Brien, another board member, signed a resolution authorizing board member Frank Gardner to sign the note.

Washington testified that while in Denver, Colorado, during the final negotiations, he overheard a telephone conversation between Tidball and Mannix. Washington described this as a "big argument" in which Tidball said, "This is complete insubordination. And this is grounds for termination." Although Washington admitted that he might have fired Mannix had Mannix been as insubordinate to him as Mannix was to ARCO, Washington also made it clear that he

4

admired Mannix for standing up to ARCO and held no prejudice against him for having done so. He felt Mannix "had a lot of guts."

Washington and ARCO closed the deal in Denver on December 18, 1985. Through Thiebes, Washington requested the resignation of all BWC board members that day. As sole shareholder, Washington elected himself, Parkinson, and Thiebes to the new board of directors. At a board meeting held the day after closing, either on the plane trip from Denver or when they landed in Missoula, the newly elected board authorized Parkinson to meet with Mannix to determine whether he should remain as president of BWC. Parkinson testified that the new board wanted him to meet with Mannix because the events surrounding the closing of the deal and Mannix's unfavorable reaction to the deal "basically raised a flag in our mind as to--is there some kind of fundamental problem here . . . ." Parkinson testified that he had any option available in dealing with Mannix's employment after that meeting.

Parkinson went to Butte the next day, December 20, and met with Mannix. The parties dispute what happened at that meeting. Parkinson testified that Mannix described the manner in which the sale was transacted as immoral and unethical and that Mannix characterized Washington as immoral; that Mannix said he would do the same thing again (apparently referring to his refusal to sign the note); that Mannix said he would always do what he thought was in BWC's best interest; and that Mannix did not offer to put the past behind them and get on to the future. Mannix testified that

5

although he felt the events surrounding the sale had created a severe problem, he said to Parkinson that he thought their only option was "to roll up our sleeves and go on from here." Mannix testified that he did not tell Parkinson that he could not go on as president of BWC; that he did not say anything to Parkinson that would lead Parkinson to believe that he did not want to continue as president; and that he did not resign or express any reluctance to continue as president.

Parkinson fired Mannix as a result of that meeting. Mannix maintains that he was fired in retaliation for his refusal to sign the $2 million note and that the decision to fire him actually was made at the board meeting held on December 19.

Mannix told his fellow employees and the press that he had been fired because of a "fundamental difference in business philosophy." Both men agree that Parkinson suggested this phrase as an explanation. On his "CLAIMANT'S DISCHARGE STATEMENT" filed in pursuit of unemployment compensation benefits, Mannix stated under oath that this was the reason for his termination. When asked if the reason was true, he checked the box marked "YES." Both Mannix and his wife admitted during trial that Mannix and the new board had a difference in business philosophy.

Mannix originally filed suit against ARCO, The Anaconda Minerals Company, BWC, Washington Corporations, and Dennis Washington. The complaint sought damages for wrongful termination, breach of the implied covenant of good faith and fair dealing, and punitive damages. ARCO, Anaconda Minerals, and Washington

6

Corporations were later dismissed. In February 1991, the District Court granted partial summary judgment in favor of Washington on all claims except one based on a theory of piercing the corporate veil. Mannix appealed and we affirmed. Mannix v. Butte Water Co. (1991), 249 Mont. 372, 816 P.2d 441.

In August 1991, the District Court granted the respondents' motion for change of venue, moving the trial from Silver Bow to Flathead County. The case was then tried before a jury. At the close of Mannix's case in chief, the District Court granted a directed verdict in favor of respondents on the claims of breach of the implied covenant of good faith and fair dealing, wrongful discharge, and punitive damages. The jury subsequently returned a special verdict in favor of respondents finding that the board of directors had a basis to conclude that it was no longer in BWC's best interest to retain Mannix as president. Mannix appeals from the judgment entered on that verdict and from the denial of his motion for a new trial.

I

Did the District Court err in sustaining the respondents' hearsay objections?

Mannix claims the District Court erred in refusing to allow him to relay the contents of conversations he had with LeRoy Wilkes, an ARCO employee, and with Ron Woods, a rate analyst for the Public Service Commission. Respondents' counsel objected on the grounds that the testimony contained impermissible hearsay. Mannix argues on appeal that the only purpose for the testimony was

7

to show that he had no information concerning the $2 million note and that other people agreed that under the circumstances the note should not be signed. Mannix argues that the testimony helped explain his actions and describe his state of mind, and therefore was permissible under this Court's holding in Moats Trucking Co., Inc. v. Gallatin Dairies, Inc. (1988), 231 Mont. 474, 753 P.2d 883.

Rule 801(c), M.R.Evid., defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Under Rule 802, M.R.Evid., "Hearsay is not admissible except as otherwise provided by statute, these rules, or other rules applicable in the courts of this state."

In Moats, the defendant wanted to introduce testimony of a conversation between its general manager and one of its employees. We held that because the testimony was not offered to prove the truth of the matter asserted, but for the purpose of showing that the statement was made and the resulting effect on the general manager's state of mind, it was permissible. Moats, 753 P.2d at 886. The present case is distinguishable from Moats. In his brief, Mannix's own argument indicates that the testimony was in fact offered for its truth. He argues that the purpose of the testimony was to "show that ARCO personnel would not provide information on the note and that those surrounding Mannix agreed with his conclusion that signing the note was imprudent."

Unlike the testimony in Moats, the testimony here was offered to prove: 1) ARCO personnel would not provide information; and 2)

8

those surrounding Mannix agreed with him. Furthermore, the evidence Mannix sought to present was admitted through other testimony. The transcript is replete with testimony that ARCO had not provided Mannix any information on the note and that Ron Woods, Mike Patterson, Bill Mufich, and John O'Brien agreed that the note should not be signed. We have previously held that where no prejudice arises and the substantial rights of a party are not adversely affected because the evidence sought to be introduced is admitted through other testimony, no reversible error occurs. See Niemen v. Howell (1988), 234 Mont. 471, 764 P.2d 854. We conclude that the District Court did not err in excluding the proffered testimony.

II

Did the District Court abuse its discretion in granting respondents' motion for change of venue?

On January 25, 1991, respondents filed a motion for change of venue based on their belief that an impartial trial could not be held in Silver Bow County and that the ends of justice would be promoted by a change of venue. Respondents requested that the motion "be a continuing motion up until the time of trial as the elements which [gave] these Defendants reason to believe that an impartial trial [could] not be had in the present venue, [were] continuing in nature and these elements exist[ed] as a result of the cumulative impact of a series of events and media attention associated therewith." After briefing and oral argument by both parties, Judge Purcell, who was then presiding over this case,

9

granted the motion.

In support of their claim that they could not get a fair trial in Silver Bow County, the respondents specifically cited the following: 1) the residents of Silver Bow County had a potential interest in the outcome of this case, and as ratepayers of BWC they were potentially plaintiffs in a class-action suit pending in Silver Bow County in which BWC and Washington were named defendants; 2) hostile public opinion had been aroused in Silver Bow County due to extensive media reports and editorials so that prejudice existed in the minds of potential jurors; 3) Judge Sullivan, who was presiding over the case when the motion was filed, had been the subject of articles and editorials in The Montana Standard suggesting that he exercised favoritism; 4) counsel for the plaintiffs in the class-action suit had been widely quoted in The Montana Standard as saying that BWC was the "alter ego" of Washington and that Washington could be held personally liable for its actions.

The respondents provided an extensive accumulation of newspaper articles and editorials in support of their motion. They cited an article dated January 15, 1991, entitled "Washington 'pocketed' $1 million, Goetz says," and an editorial criticizing Judge Sullivan's support of legislation regarding non-disclosure of judiciary disciplinary actions. That article mentioned Judge Sullivan's removal from a case involving Washington because it was alleged by one of the parties in that case that Judge Sullivan's personal and family relationship with Washington was too close.

10

In granting the respondents' motion, Judge Purcell stated:

> Because of what has transpired in this thing over the last -- over a long period of time, . . . there are pros and cons both ways in this thing, as to whether Mr. Mannix has a lawsuit. There is that rumor on the street. I can say that. A lot of people say that he does not have a case here. And a lot of people say that he is entitled to get all kinds of remuneration. So the Court is taking -- I have studied this thing, basically, since the Motions were before me, and I am going to grant the Motion for a Change of Venue in this case.
>
> . . .
>
> And I think that it is in the best interest of all the parties. I want both parties here to get as fair a trial as possible. There was an article that appeared in the Montana Standard around the 4th of July here, that came out of nowhere. I mean, there was nothing going on, in my opinion that -- That it was not fair, as far as I can see, to either side.

Section 25-2-201, MCA, the statute governing change of venue provides in pertinent part:

> **When change of venue required.** The court or judge must, on motion, change the place of trial in the following cases:
>
> . . .
>
>     (2) when there is reason to believe that an impartial trial cannot be had therein;
>     (3) when the convenience of witnesses and the ends of justice would be promoted by the change.

A movant is entitled to a change of venue upon a showing that there are reasonable grounds to believe that prejudice actually exists which creates a reasonable apprehension that a fair and impartial trial cannot be held in the current venue. State v. Pease (1987), 227 Mont. 424, 432, 740 P.2d 659, 664; relying on State v. Holmes (1983), 207 Mont. 176, 181, 674 P.2d 1071, 1073. Absent an abuse of discretion, the district court's ruling on a

motion for change of venue will not be disturbed. When pre-trial publicity is the grounds upon which prejudice is based, the publicity "must be inflammatory and create a reasonable apprehension that a fair trial . . ." cannot be had in the current venue. Pease, 740 P.2d at 664 (quoting Holmes).

Mannix argues that the respondents' reliance on the fact that the potential jurors might be members of a class action suit in which the respondents were the defendants, and on the fact that the jurors, as ratepayers, had an interest in the case, is misplaced. Mannix cites School District No. 1 v. Globe and Republic Ins. Co. (1963), 142 Mont. 220, 383 P.2d 482 (any interest potential jurors had as taxpayers was not sufficient to justify change of venue); and Carter County v. Cambrian Corp. (1963), 143 Mont. 193, 387 P.2d 904 (jurors not disqualified where statute specifically provided that jurors were not disqualified for being taxpayers of a county that is party to the suit), to support his argument. However, this was not the only basis on which respondents relied or on which the District Court granted the motion.

Mannix also argues that under the twenty-day requirement of Rule 12(b)(iii), M.R.Civ.P., the respondents were only entitled to rely on the two newspaper articles cited above as they were the only "events" that occurred within twenty days of filing of the motion. He argues that any prejudice created based on these two articles alone does not rise to the level required to grant a change of venue.

Rule 12(b)(iii), M.R.Civ.P., sets forth the time limitations

12

for bringing a motion for change of venue under subsections (2) and (3) of § 25-2-201, MCA.

> (iii) Any request for change in place of trial for grounds 2 and 3 of section 25-2-201, Montana Code Annotated, must be presented by motion within 20 days after the answer to the complaint, or to the cross-claim where a cross-claim is filed, or the reply to any answer, in those cases in which a reply is authorized, has been filed; except that whenever at some time more than 20 days after the last pleading has been filed an event occurs which thereafter affords good cause to believe that an impartial trial cannot be had under ground 2 of said section 25-2-201, and competent proof is submitted to the court that such cause of impartiality did not exist within the 20-day period after the last pleading was filed, then the court may entertain a motion to change the place of trial under ground 2 of section 25-2-201 within 20 days after that later event occurs.

The respondents' motion was a continuing one to cover future articles and editorials regarding the respondents. Judge Purcell even noted the publicity as late as July 1991. The "event" was a barrage of articles and editorials regarding BWC and Washington. In such a situation, strict application of the twenty-day rule is impractical. This Court previously has considered a series of newspaper articles that occurred over more than a twenty-day period. In Pease, we considered a series of nineteen newspaper articles that had been published over the course of the defendant's case. Rule 12(b)(iii) contained the same twenty-day limitation then as it does now. In Pease, however, we specifically noted that the articles were news articles and not editorials. Here, the articles included numerous editorials concerning the respondents.

As noted above, Judge Purcell expressed valid concerns about each party's ability to receive a fair trial in Silver Bow County. We conclude that he did not abuse his discretion in granting

13

respondents' motion for change of venue.

### III

Did the District Court err in sustaining respondents' objection to lay witness opinion testimony?

During his case in chief, Mannix called Bill Mufich, a board member at the time BWC was sold to Washington. The following exchange took place.

Q. And did you think that it was in the best interest of the Butte Water Company to terminate Gary Mannix?

MR. MACDONALD [respondents' counsel]: To which I will object, Your Honor. This invades the province of the jury.

THE COURT: Sustained.

Q. Do you have an opinion, based upon your experience as a director, as to whether or not, it was in the best interest of the Butte Water Company to retain Gary Mannix as its president?

MR. MACDONALD: Same objection. It calls for--

THE COURT: He is only asking him, does he have an opinion. Proceed.

Q. You may answer.

A. Yes.

Q. And what is that opinion?

MR. MACDONALD: Same objection.

The court sustained the objection. Mannix argues on appeal that "Mufich's long relationship with ARCO and the Butte Water Company provided a basis for him to testify on his perceptions concerning the corporation's best interests." Mannix was seeking lay witness opinion testimony from Mufich. Under Rule 701, M.R.Evid., the testimony must have been rationally based on Mufich's perceptions

14

and helpful to a clear understanding of his testimony or the determination of a fact in issue. Mannix does not argue that the opinion testimony was offered because it helped the jury understand Mufich's testimony; therefore, in order to be admissible it must have been helpful in determining a fact in issue. We hold that Mufich's proffered testimony failed the second part of this test.

The special verdict form given to the jury was based on § 35-1-411, MCA (1985). That statute read:

> **Removal of officers.** Any officer or agent may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights. [Emphasis added.]

On its face the statute is clear that the determination to terminate an officer is a subjective one for the board of directors to make.

The special verdict form asked the following question:

> Did the Board of Directors of The Butte Water Company in their judgment have a basis to conclude on December 23, 1985, that it was no longer in the best interests of The Butte Water Company, as is defined in these instructions, to retain the Plaintiff as its President? [Emphasis added.]

The question here was not whether in Mufich's opinion it was in the best interests of the corporation. As he was not a member of the board that made the decision, his opinion was irrelevant and inadmissible; it did not go to the determination of a fact in issue. Although the District Court excluded this testimony on the grounds that it invaded the province of the jury, because we conclude under Rule 701, M.R.Evid., that its ultimate determination

15

to exclude the evidence was correct, it will be upheld. See District No. 55 v. Musselshell County (1990), 245 Mont. 525, 802 P.2d 1252; Jerome v. Pardis (1989), 240 Mont. 187, 783 P.2d 919.

IV

Did the District Court err in the manner in which it applied its order granting respondents' motion in limine?

On September 20, 1991, the District Court granted respondents' motion in limine which sought to exclude evidence regarding the authority of the newly elected board of directors to act. In its memorandum, the court stated that "[t]he motion is granted as stated but it shall be narrowly construed to exclude evidence regarding the legal authority of the board to act but not evidence regarding the nature and character of those actions and their propriety." During trial, Mannix's counsel conceded the legality of the board's meetings. However, Mannix claims that the District Court erred in the manner in which it applied this order. Mannix claims that the District Court committed prejudicial error by preventing him from introducing evidence of the following: 1) the newly elected board did not include anyone from BWC in its meeting; 2) the board did not include Skip Dunfee, BWC's secretary, in its meetings; 3) the board did not seek opinions from BWC personnel before it decided to terminate Mannix.

Our reading of the record, however, reveals that Mannix was allowed to introduce the evidence he claims was excluded. The record reveals the following testimony was given by Skip Dunfee on direct examination:

16

Q. And what was your position in December 1985, sir?

A. I was comptroller/secretary.

Q. And what are the differences in job responsibilities between those that you had in December 1985 and now?

A. As a secretary, I was in charge of the minutes of the quarterly meetings; of the annual meeting. I am responsible for keeping track of those records. I had the seal of the Butte Water Company which was used on all legal documents et cetera. . . .

Q. And that would have been prior to the time, then, that Washington became the owner of the Butte Water Company, on December 18, 1985.

A. That is correct.

. . .

Q. Mr. Dunfee, there has been received here in evidence an exhibit that has been marked as Plaintiff's Exhibit No. 3. The exhibit contains the minutes of two Board meetings with the Butte Water Company. One is dated December 19, 1985; and the other is dated December 23, 1985. I will just ask you to examine the exhibit and I will give you a few minutes to do so, because you may not have seen it before.

A. Okay.

Q. Have you had a chance to look at the minutes of both meetings?

A. Yes, I have.

. . .

Q. Did you receive notice of either of those two meetings?

A. No, sir.

Q. Did you attend either of those two meetings of the Butte Water Company?

A. No, sir.

Q. What was your position with the company at the time of the meetings?

17

A.  Comptroller/secretary.

Q.  Okay.  When did you become comptroller/secretary for the Butte Water Company?

A.  In the latter part of 1967.

Q.  What are the duties--Strike that.  Are there by-laws of the Butte Water Company that regulate or describe, rather, the duties of the secretary/comptroller?

A.  Yes.

.  .  .

Q.  Can you describe for the jury what it was that a comptroller/secretary was called upon to do for the company.

A.  As I mentioned earlier, the secretary kept the minutes of all the quarterly meetings.

.  .  .

Q.  In Plaintiff's Exhibit No. 3, which purports to be minutes of a special meeting of the Board of Directors of the Butte Water Company, and it was shown as the secretary by John Thiebes.  The first meeting on December 19, 1985, shows Mr. Thiebes signing that as secretary. What was your position on December 19, 1985?

A.  I thought that I was secretary.

Q.  Were there two secretaries?

A.  There could have been.

.  .  .

Q.  Mr. Dunfee, you were referring to Plaintiff's Exhibit 3 which referenced a Board meeting on December 19, 1985, and a Board meeting on December 23, 1985.

A.  Okay.

Q.  I will ask you if you received notice of either of those meetings?

A.  No, sir, I did not.

Q.  Did you attend either of those meetings, Mr. Dunfee?

18

A.  No, sir.

. . .

Q.  And during the time that Gary Mannix was the president of the Butte Water Company, did you attend all the Board of Directors' meetings?

A.  To my knowledge, I would say 95 percent of them.

. . .

Q.  And at the time that we are talking about, who were the members of the Board of Directors for the Butte Water Company?

A.  Mr. Mannix, Mr. Patterson, Mr. Gardner, Mr. O'Brien and Mr. Mufich.

Q.  So in this discussion, there was Mike Patterson, who was a member of the Board of Directors, right?

A.  Yes.

Q.  Mr. Mannix, who was chairman of the Board of Directors.

A.  Yes.

Q.  And, yourself, who attended the Board meetings and took the minutes as the secretary of the company.

A.  That is correct.

. . .

Q.  . . . After Washington became owner on December 18, 1985, did you -- were you ever noticed of anymore Board meetings during your tenure with the Butte Water Company?

MR. MACDONALD:  To which we will object, Your Honor. That is irrelevant.

THE COURT:  He may answer.

Q.  Go ahead.

A.  No, sir.

During cross-examination of Dorn Parkinson, Mannix's counsel elicited the following testimony:

19

Q. All right. In making this decision, to terminate Mr. Mannix, did you contact Bill Mufich who had served as a Board member of the Butte Water Co. immediately prior to your acquisition and ask Mr. Mufich whether Mr. Mannix had ever "bucked" policy of the Board of Directors?

A. No I did not.

Q. Did you ever contact Mr. Patterson, a Board member, to ask him whether or not Mr. Mannix had ever "bucked" policy of the Board of Directors?

A. No, I did not.

Q. Did you make any attempt to contact Mr. Dunfee, the secretary who took all the minutes at Board of Directors' meetings, to determine if Mr. Mannix had ever gone against the wishes of the Board of Directors of the Water Co.?

A. No, I did not.

Q. Did you make any attempt, whatever, to ascertain what kind of a record Mr. Mannix had had in the past with the Water Co., with respect to his relationship with the Board of Directors?

A. I instigated no investigation.

Q. To your knowledge, did Mr. Washington instigate any investigation?

A. Did not, to my knowledge.

Q. To your knowledge, did Mr. Thiebes initiate any investigation?

A. Did not.

Because Mannix was allowed to present the testimony he claimed was excluded, we conclude the District Court did not err in the manner in which it applied its order.

V

Did the District Court abuse its discretion in refusing to allow Mannix's expert witness to testify?

Mannix retained Alan Brown to testify about proper employment

20

and termination practices in effect at the time he was terminated and how the covenant of good faith and fair dealing applied in those situations. Mr. Brown had worked as a labor relations manager and personnel representative from 1967 to 1984 with the Anaconda Company and Champion International. Since 1984 he had worked as a labor relations consultant. The respondents moved to exclude Mr. Brown's testimony on the ground that he was not qualified to testify regarding the relationship between corporate officers and boards of directors or the termination of a corporate officer. The District Court granted the motion based on what it learned from Mr. Brown's deposition. In his deposition, Mr. Brown admitted: 1) he had never been involved in the termination of a corporate president or other officer; 2) he had never been involved in the termination of a board member; 3) he had never attended any special seminars directed toward termination policies regarding officers or directors; 4) he did not consider himself an expert on corporate law; 5) he had never been involved in a case involving the termination of an officer or director; and 6) he did not hold himself out as an expert on the relationship between officers and directors or the interpretation of by-laws regarding that relationship.

A witness qualified as an expert may testify where specialized knowledge will assist the trier of fact to understand the evidence or determine a fact. Rule 702, M.R.Evid. The existence and breach of the covenant of good faith and fair dealing is a proper subject for expert testimony. See Niles v. Big Sky Eyewear (1989), 236

21

Mont. 455, 771 P.2d 114; Crenshaw v. Bozeman Deaconess Hospital (1984), 213 Mont. 488, 693 P.2d 487. "Questions of the admissibility of evidence are left largely to the discretion of the trial court, which will be overturned only in cases of manifest abuse of that discretion." Zugg v. Ramage (1989), 239 Mont. 292, 296, 779 P.2d 913, 916. The district court's determination on the qualification and competency of an expert witness to testify will only be disturbed when there is a showing that the district court abused its discretion. Foreman v. Minnie (1984), 211 Mont. 441, 445, 689 P.2d 1210, 1212; Zugg, 779 P.2d at 917.

In the present case, the jury may have needed assistance in understanding the relationship between the officers and directors of a corporation and the interplay of the covenant of good faith and fair dealing in that relationship. However, the District Court determined that Mr. Brown, by his own admissions, was not qualified to testify on this matter. We conclude that the District Court did not abuse its discretion by excluding Mr. Brown's testimony.

VI

Did the District Court err in dismissing all claims based on breach of the implied covenant of good faith and fair dealing?

At the close of Mannix's case in chief, the District Court granted a directed verdict in favor of respondents on all claims based on breach of the implied covenant of good faith and fair dealing. Mannix claims that he was forced to go along with this ruling because, as a result of the exclusion of Alan Brown's testimony, he had not been able to present evidence on the

22

existence of the covenant. As discussed above, the District Court properly excluded Mr. Brown's testimony.

In determining whether the District Court properly withdrew the issue from the jury, we look to "whether reasonable men could draw different conclusions from the evidence. If only one conclusion is reasonably proper, then the directed verdict is proper." Semenza v. Leitzke (1988), 232 Mont. 15, 18, 754 P.2d 509, 511 (citation omitted).

It is Mannix's position that the controlling law on the termination of a corporate officer was the "Best Interest Test" found in § 35-1-411, MCA (1985), as supplemented by our decisions in Gates v. Life of Montana Ins. Co. (1982), 196 Mont. 178, 638 P.2d 1063 (Gates I), and progeny. Section 35-1-411, MCA (1985), stated:

> **Removal of officers.** Any officer or agent may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

In Gates I we held that the covenant of good faith and fair dealing was implied in the employment contract of the plaintiff/employee. 638 P.2d at 1067. In Gates v. Life of Montana Ins. Co. (1983), 205 Mont. 304, 307, 668 P.2d 213, 214-215 (Gates II), we stated that the duty created by the covenant arises out of the employment relationship and is imposed by operation of law. For purposes of our discussion here we will assume, without deciding, that the covenant supplements the statute.

23

However, whether the covenant "is implied in a particular case depends upon objective manifestations by the employer giving rise to the employee's reasonable belief that he or she has job security and will be treated fairly." Dare v. Montana Petroleum Mktg. Co. (1984), 212 Mont. 274, 282, 687 P.2d 1015, 1020. The objective manifestations must come from the employer. Karell v. American Cancer Society (1989), 239 Mont. 168, 175, 779 P.2d 506, 510. We went on in Karell to expound on the importance of the employer's role in determining whether the covenant was implied.

> The employer's position is pivotal in the employment relationship. The employer has the exclusive right to hire and fire. The employer is responsible for the employee's performance and is in the best position to evaluate it. The employer has the power to rebuke or reward the employee and is the only one with the power to create job security.

Karell, 779 P.2d at 510.

Mannix argues that his twelve years of service, his raises, and the praise he received from peers and supervisors gave rise to the covenant. However, Mannix admitted that he realized he served at the discretion of the board of directors and was aware of that when he became president.

Because Mannix presented no evidence of objective manifestations, the District Court properly granted the directed verdict.

VII

Did the District Court err in instructing the jury?

Lastly, Mannix argues that the District Court erred in instructing the jury. The District Court has discretion in deciding how to instruct the jury, taking into account the theories

24

of contending parties, and we will not overturn that decision except for abuse of discretion. Cline v. Durden (1990), 246 Mont. 154, 164, 803 P.2d 1077, 1083. "[I]nstructions must be considered in their entirety, and to determine whether instructions were properly given or refused this Court will read them in connection with other instructions given and consider them in the light of the evidence introduced." Brown v. North Am. Mfg. Co. (1978), 176 Mont. 98, 114, 576 P.2d 711, 721 (citation omitted).

Mannix offered instructions based on both the "best interest" statute and this Court's decision in Buck v. Billings Montana Chevrolet, Inc. (1991), 248 Mont. 276, 811 P.2d 537. Instructions numbered 13 and 15A, which were given by the court read:

> INSTRUCTION NO. 13. The law of the State of Montana, pursuant to Montana Code Annotated § 35-1-411, is that any officer may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby.

> INSTRUCTION NO. 15A. You are instructed that a legitimate business reason is a reason that is neither false, whimsical, arbitrary or capricious, and it has some logical relationship to the needs of the business. In applying this definition, one must take into account the right of an employer to exercise discretion over who it will employ and keep in employment.

Instruction 15A comes from Buck where this Court defined the term "legitimate business reason" in the context of the Wrongful Discharge from Employment Act, § 39-2-901 et seq.

Mannix's proposed instruction number 22, which was refused, read:

> A determination made by the board of directors to terminate a corporate officer must be rationally related to a legitimate business interest.

25

Mannix argues that these instructions, when taken together, helped define and limit the scope of the directors' judgement. The refused instruction served to link the best interest instruction (#13) to the instruction defining legitimate business interest (#15A). Without it, Mannix argues, instruction #15A made no sense.

> However, the court also gave the following instructions:
>
> INSTRUCTION NO. 15: The employer is entitled to serve its own legitimate business interests; an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world and the employer needs flexibility in the face of changing circumstances.
>
> INSTRUCTION NO. 22: If you find that the Plaintiff's discharge was not, in the judgment of the Board of Directors, in the best interest of the Butte Water Company as defined by these instructions, then you must also determine whether the Defendant's actions proximately caused any loss incurred by Plaintiff. [Emphasis added.]
> . . .

The special verdict form also included the phrase "in the best interest of the Butte Water Company as defined in these instructions." We note that Instruction 15A was the only instruction containing a definition. Also, Mannix's counsel argued to the jury during closing that it was "to determine whether or not the reasons that they [the board of directors] pursued were false, whimsical, arbitrary or capricious. And whether they had a logical relationship to the needs of this business."

When read as a whole, the instructions sufficiently instructed the jury as to the scope of the board's judgment. Therefore, the District Court did not abuse its discretion.

26

Affirmed.

We concur:

_J. H. Turnage_
Chief Justice

_Karla M. Shay_

_John Conway Hetheson_
Justice

_R. C. McDonough_

Justices

27

Justice Terry N. Trieweiler dissenting in part and concurring in part.

I dissent from those parts of the majority opinion which affirmed the District Court's exclusion of opinion testimony from Bill Mufich, and the District Court's refusal to affirmatively instruct the jury on the defendants' duty to plaintiff.

As submitted to the jury, plaintiff's claim against defendants was based solely on his contention that he was terminated from employment with the Butte Water Company in violation of § 35-1-411, MCA (1985). That statute permitted his removal only when it was in the best interests of the corporation.

Prior to Dennis Washington's purchase of the Butte Water Company, Mufich served as a director and was familiar with both the company's needs and Mannix's ability to serve those needs as president. Therefore, he had knowledge based on his personal observations which was directly relevant to the issue of whether Mannix's removal would serve the best interests of the corporation. His opinion was admissible pursuant to Rule 701, M.R.Evid., which provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

The majority disposes of Mufich's proffered testimony on the basis that he was not a member of the board at the time that Mannix was terminated, and therefore, was not in a position to state

28

whether "in their judgment" it was in the corporation's best interest to terminate Mannix. That conclusion misses the point.

No one other than the directors who worked for Washington can testify regarding their judgment. Obviously, these people who worked for and owed their livelihood to Washington would never admit that they acted for reasons other than the best interests of the Butte Water Company. Does that mean that Mannix should be precluded from offering objective evidence from which the jury could infer that Washington's agents acted for reasons other than those they stated? Obviously not.

Mufich was a member of the Butte Water Company's board of directors the day before it was purchased by Washington. The nature of the water company's operation, and therefore, its best interests, did not change one day later because its stock was purchased and new directors were appointed by the purchaser. Mufich was as qualified to express an opinion about the corporation's best interests the day after Washington's purchase as he was the day before the purchase took place. To hold otherwise leaves the proof of the crucial issue in this case within the exclusive control of the people accused of ignoring the company's best interest to serve the retaliatory interest of its purchaser. That seems to me like an odd way to arrive at the truth in this case.

Presumably, the best interests of the Butte Water Company did not change overnight because of a change in the personnel who served as its directors. Mufich had relevant information based on

29

his personal observations and experiences regarding the best interests of the corporation. The jury should have been allowed to hear his opinion and then infer whether, in the judgment of the new directors, Mannix's termination was in the best interest of the Butte Water Company, or simply served Washington's interest in retaliation.

The ruling of the District Court excluding Mufich's testimony, and the decision of the majority to affirm that ruling, are especially unfair and confusing in light of the following testimony which was solicited from and given by Washington's current director, Dorn Parkinson:

> Q. [by attorney MacDonald] Mr. Parkinson, you have testified that Mr. Mannix confirmed that he thought the transaction was [an] immoral and unethical transaction. Based upon that confirmation, did you have an opinion as to whether or not, it was in the best interest of the Butte Water Company to retain him as president?
>
> Mr. Morrison: Objection. It calls for a conclusion of the witness, invades the province of the jury.
>
> The Court: I think he has already answered the question. It is repetitious. I think you have already asked that type of question Mr. MacDonald.
>
> Mr. MacDonald: (continuing) Might I, I don't have a specific recollection of every question that I have asked. So, I try this, and you may have the same objection. With regard to the fact that you and Mr. Mannix had the conversation where you characterized what had happened as a fundamental difference in business philosophies. Did you have an opinion as to whether or not it would be appropriate to retain a president that had such differences or, at least, seemed to acknowledge that such differences existed as the president of the Butte Water Company?
>
> A. No, in my opinion it would not be appropriate. If in fact you had a situation where you have a difference of opinion of how, and what kind of relationship you

30

should have between the president and the directors that you have an unacceptable situation and correction needs to be taken.

Q. What was your judgment as the person, authorized by the Board of Directors with regard to retaining Mr. Mannix at the conclusion of the meeting on the 20th?

A. It was my opinion that it was not in the best interest of the Water Co. to retain Mr. Mannix. And as I testified earlier there were several things where I questioned his judgment, but those were not fatal flaws, I think those were situations that we could probably work with him in the future. Better educate him, develop a better relationship with the Board. So we wouldn't run into some of those difficulties. But I saw no way that we could that day, tomorrow or the next day or a year from there be able to change his fundamental belief that this transaction itself was immoral and therefore the people who participated in it, were probably immoral and he in his sole discretion was going to determine what was right. He just seemed to have this feeling that he was the only one, and the best one, to make those kinds of determinations for the Butte Water Co. I didn't see how you could sit down and work with somebody and retrain or re-educate or change such basic fundamental philosophies.

Because Mufich's testimony was excluded and Parkinson's testimony was admitted, Mannix was denied any opportunity to prove through anyone familiar with the corporation that his termination was not in the company's best interest, while defendants were allowed to prove through people who owed their livelihood to Washington that Mannix's termination was in the corporation's best interests.

For these reasons, I conclude that Mufich's opinion testimony was admissible under Rule 701, the District Court erred by excluding it, and that error affected substantial rights of Mannix.

I conclude that it was also error for the District Court to reject Mannix's proposed Jury Instruction No. 22. As submitted to

31

the jury, Mannix's claim was based solely upon his employer's obligation to act in the company's best interests. However, nowhere in the entire set of jury instructions that were submitted to the jury, did those instructions affirmatively state a duty on the part of the board to act in the corporation's best interest when it terminated Mannix.

The District Court gave five separate instructions emphasizing the broad discretion given to directors of corporations when deciding personnel matters. They were as follows:

INSTRUCTION NO. 13

The law of the State of Montana, pursuant to Montana Code Annotated §35-1-411, is that any officer may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby.

INSTRUCTION NO. 14

The employer of an employee who occupies a sensitive managerial or confidential position has an interest in protecting its investment and running its business as it sees fit and thus has a greater ability to terminate such employee as compared to the termination of an employee whose duties do not require the exercise of broad discretion.

INSTRUCTION NO. 15

The employer is entitled to serve its own legitimate business interests; an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world and the employer needs flexibility in the face of changing circumstances.

INSTRUCTION NO. 15A

You are instructed that a legitimate business reason is a reason that is neither false, whimsical, arbitrary or capricious, and it has some logical relationship to the needs of the business. In applying this definition, one must take into account the right of an employer to

32

exercise discretion over who it will employ and keep in employment.

INSTRUCTION NO. 16

When as a matter of policy, a corporate employer in filling a sensitive managerial or confidential position, prefers to retain an employee in whom it holds great trust, to manage its investment, it should be allowed the placement of a person who conceivably holds the same business values and philosophies as the board of directors in a newly acquired business.

However, there was not one single instruction given by the District Court which affirmatively stated any duty on the part of defendants to act in accordance with § 35-1-411, MCA (1985). The jury was left to speculate about what set of facts would entitle Mannix to prevail. The majority opinion attempts to fill that void by referring to the court's Instruction No. 22. However, Instruction No. 22 did not set forth any affirmative duty on the part of defendants. It was simply another cautionary instruction advising the jury that before damages could be awarded it had to find that defendants' conduct caused damages.

The District Court's instructions gave the jury no basis for finding liability on the part of defendants. They gave only repeated examples of why defendants' conduct could be excused. The instructions, when considered as a whole, did not fairly frame the issues to be resolved by the jury.

Mannix was entitled to an instruction clearly setting forth whatever duty he was owed by defendants and which formed the basis of his claim. I conclude that the District Court erred by not giving one.

33

I concur with the majority's disposition of issues numbered I, II, IV, V, and VI. However, for the reasons set forth above, I would reverse the judgment of the District Court and remand for a trial in which the jury is allowed to consider all of the relevant opinion testimony and not just the opinions proffered by defendants. At the conclusion of that retrial, I would order that the jury be somehow instructed on the affirmative duty of defendants to act in accordance with the best interests of the corporation, not simply its new owner.

_____
Justice

Justice Hunt joins in the foregoing dissent and concurrence.

_____
Justice

June 11, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Frank B. Morrison, Jr. and John M. Morrison
David Ness
Morrison Law Offices
80 So. Warren
Helena, MT   59601

Ronald B. MacDonald and Darla J. Keck
Datsopoulos, MacDonald & Lind
201 W. Main, Central Square Bldg.
Missoula, MT   59802



ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
   Deputy